# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **SCOTT JORDAN, JR.,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **No. 2:17-cv-00025-JHR** |
| | ) | |
| **TOWN OF WALDOBORO, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

## MEMORANDUM DECISION ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT[1]

In this action stemming from the arrest and prosecution of the plaintiff on charges of theft of his late father's property, the remaining five defendants, the Town of Waldoboro, Maine ("Town"), Waldoboro Chief of Police William Labombarde, and Waldoboro police officers Lawrence W. Hesseltine, Jr., Jeffrey Fuller, and Andrew Santheson, seek summary judgment as to all 26 counts against them. *See* Defendants' Motion for Summary Judgment ("Motion") (ECF No. 37) at 1-3; Second Amended Complaint ("Operative Complaint") (ECF No. 29) ¶¶ 73-237.[2]

For the reasons that follow, I find no triable issue as to any of the plaintiff's claims, and, accordingly, grant the Motion.

## I.   Applicable Legal Standards

### A.   Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] The parties have agreed to have me preside over all proceedings in this action, including the entry of judgment. ECF No. 15.

[2] Subsequent to the filing of the Operative Complaint, the parties stipulated that all claims against the Waldoboro Police Department ("WPD") should be construed as claims against the Town, *see* Stipulation of the Parties (ECF No. 31), and stipulated to the dismissal of Counts XX (Violation of 42 U.S.C. § 1983 Due Process/Defamation), XXIII (Defamation), and XXIV (False Light) against Fuller and Santheson, *see* Stipulation of Dismissal as to Fewer Than All Claims and as to Fewer Than All Defendants Pursuant to F.R.Civ.P. 41 (ECF No. 32).

56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

**B. Local Rule 56**

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id*. The nonmoving party must then submit a responsive

"separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id*. The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id*.

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II. Factual Background

### A. Stipulated Facts and Other Relevant Facts

The parties' stipulated facts, as well as relevant statements of material facts credited to the extent admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of the plaintiff as nonmovant, reveal the following.[3]

At all relevant times, plaintiff Scott Jordan, Jr. ("Junior" or "the plaintiff") was employed by the Cumberland County Sherriff's Office as a Lieutenant in the corrections division. Stipulated Facts (ECF No. 34) ¶ 1. At all relevant times, defendant Labombarde was employed by the Town as the Chief of Police of the WPD, defendants Hesseltine and Fuller were employed by the Town as patrol officers for the WPD, and defendant Santheson was employed by the Town as a reserve patrol officer for the WPD. *Id*. ¶¶ 2-5.

Junior is the son of Scott M. Jordan, Sr. ("Senior"). *Id*. ¶ 6. As of May 2014, Senior was living independently in his own home in Waldoboro. *Id*. ¶ 7. Senior and Junior had made a plan for Senior to move in with Junior and Junior's minor daughter. *Id*. ¶ 8. On or about May 12, 2014, Senior was taken by ambulance to the emergency department of the Pen Bay Medical Center in Rockport, Maine, and admitted to the hospital. *Id*. ¶ 9.

On May 15, 2014, Senior executed an Appointment of Agent Financial Power of Attorney ("POA") appointing Junior as his agent and attorney-in-fact. *Id*. ¶ 10. The POA was drafted by Senior's attorney Wayne R. Crandall of Crandall, Hanscom & Collins, P.A., in Rockland, Maine. *Id*. ¶ 11. Senior executed the POA before Elizabeth Hilchey, a notary public, and Kylie

---

[3] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise. I omit several of the plaintiff's qualifications because they rephrase the defendants' statements without material change or constitute arguments rather than facts, and omit the majority of the remainder because, even, if taken at face value, they are not outcome-determinative for the reasons explained in section B of this Factual Background and in Section III (Discussion), below.

Wadsworth, a witness, while he was still an inpatient at Pen Bay Medical Center. *Id*. ¶¶ 12-13. Senior was discharged from the hospital on or about May 23, 2014. *Id*. ¶ 14.

In a letter dated July 31, 2014, Senior revoked the POA he had previously granted to Junior. *Id*. ¶ 15. An attorney for Senior, William D. Pease of The Pease Law Firm, sent a letter to Junior dated August 6, 2014. *Id*. ¶ 16. Junior sent Pease a written response dated August 12, 2014. *Id*. ¶ 17.

In the fall of 2014, Hesseltine had a number of conversations with Senior in which Senior complained that Junior had taken property belonging to him and refused to return it. Defendants' Statement of Material Facts Not in Dispute ("Defendants' SMF") (ECF No. 38) ¶ 12; Plaintiff's Amended Opposing Statement of Material Facts, etc. ("Plaintiff's Amended Opposing SMF") (ECF No. 57) ¶ 12. Senior was 67 years old at the time. *Id*. ¶ 13.

On or about October 17, 2014, Senior made a complaint to the WPD about Junior. Stipulated Facts ¶ 18. Fuller took the complaint from Senior on that date. *Id*. ¶ 19. Senior told Fuller that he had recently been hospitalized as the result of a liver condition that at times caused toxins to build up in his body, causing him to become confused and not act normally. Defendants' SMF ¶ 16; Plaintiff's Amended Opposing SMF ¶ 16.[4] Senior told Fuller that, while he was hospitalized, he had executed a POA presented to him by his son. *Id*. ¶ 17.

Senior reported to both Fuller and Hesseltine that, while Junior had the POA, he had taken Senior's 2003 Chevrolet pickup truck and transferred its title ownership to himself. *Id*. ¶ 20. Senior reported to both Fuller and Hesseltine that Junior was refusing his demands to return his truck, with an appropriate title. *Id*. ¶ 21. Hesseltine confirmed that the title to Senior's truck was now in Junior's name. *Id*. ¶ 22. Senior also advised both officers that Junior had taken several

---

[4] My recitation incorporates the plaintiff's qualification.

firearms belonging to him and was refusing to return them, as well. *Id*. ¶ 23. Senior requested that the WPD help him recover his pickup truck and firearms. *Id*. ¶ 25.

When Fuller took Senior's complaint on October 17, 2014, he asked him to provide him a copy of the POA, and Senior delivered a copy of it to the Waldoboro police station the following day, October 18, 2014. *Id*. ¶ 26; Stipulated Facts ¶ 19. Fuller spoke by telephone with Junior on October 17, 2014, and Junior said that he would return Senior's truck but without changing the title owner and would not return his firearms. Defendants' SMF ¶ 28; Plaintiff's Amended Opposing SMF ¶ 28. When Fuller asked Junior to explain where the money he had obtained from selling Senior's possessions while he was hospitalized had gone, Junior said that it had all been spent either to pay Senior's bills or fix up Senior's house. *Id*. ¶ 29.

Junior told Fuller that he and Senior had agreed to fix up Senior's house and sell it and then have Senior move in with Junior at Junior's house in Standish, Maine. *Id*. ¶ 30. Junior told Fuller that after Senior was released from his various hospital stays during the May through July time period, he had changed his mind about selling his house and moving and instead decided he wanted to stay in his own home. *Id*. ¶ 31.[5] Junior claimed to Fuller that he had spent a large amount of his own time and money trying to fix up his father's home before Senior changed his mind about selling it. *Id*. ¶ 32. Fuller asked Junior to provide him a written statement in response to Senior's complaint. *Id*. ¶ 33. Junior delivered to the police station copies of the August 6, 2014, letter from Pease and his August 12, 2014, written response, as well as some receipts for vehicle repairs to Senior's truck and the purchase of some building materials. *Id*. ¶ 34; Stipulated Facts ¶ 22.

---

[5] The plaintiff's objection to this statement on the basis that it is vague as to the time Senior had multiple hospitalizations, Plaintiff's Amended Opposing SMF ¶ 31, is overruled. In the alternative, the plaintiff qualifies the statement, *id*., and I have incorporated the relevant portion of his qualification therein.

Because Senior had also spoken to Hesseltine about his complaints against his son, and because Fuller was about to leave for an extended vacation, it was determined that Hesseltine would handle the investigation of Senior's complaints going forward. Defendants' SMF ¶ 35; Plaintiff's Amended Opposing SMF ¶ 35. Hesseltine received the documents that both Senior and Junior had provided to Fuller. *Id.* ¶ 40.

On November 1, 2014, Hesseltine met with Senior at his home to obtain information about his complaint against his son. *Id.* ¶ 41. Senior claimed to Hesseltine that he should not have been asked by Junior to sign the POA on that date because he was still suffering from confusion, that he did not read it, and that he felt almost pressured by Junior to sign it. *Id.* ¶ 45.

Senior told Hesseltine that Junior had sold personal property of his valued at more than $3,000 while he was hospitalized. Defendants' SMF ¶ 49; Affidavit of Lawrence Hesseltine ("Hesseltine Aff.") (ECF No. 38-2), attached to Defendants' SMF, ¶ 6.[6] Senior also told Hesseltine that Junior had sold a trailer belonging to Senior for $2,000 but did not use a portion of the sale proceeds to pay Senior's property tax bill as he had instructed him to do. Defendants' SMF ¶ 50; Hesseltine Aff. ¶ 6.[7]

Senior advised Hesseltine that Junior had possession of Senior's debit card until he was released from the hospital in July 2014 and, upon his release, Senior learned that more than $2,000 in Social Security and Veterans Administration benefits that had been direct-deposited in his bank account while he was hospitalized had been withdrawn by Junior and was unaccounted for. Defendants' SMF ¶ 51; Hesseltine Aff. ¶ 6.[8]

---

[6] The plaintiff purports to deny the entirety of this statement; however, I omit only that portion controverted by his assertions. Plaintiff's Amended Opposing SMF ¶ 49.
[7] The plaintiff purports to deny this statement; however, his assertions do not controvert it. Plaintiff's Amended Opposing SMF ¶ 50.
[8] The plaintiff purports to deny this statement; however, his assertions do not controvert it. Plaintiff's Amended Opposing SMF ¶ 51.

Senior provided Hesseltine with detailed written statements containing his allegations of theft of his property and money by Junior while he held the POA, along with lists of missing property. Defendants' SMF ¶ 52; Hesseltine Aff. ¶ 6.[9] Senior told Hesseltine that, because Junior was using the powers granted by the POA to take actions that were not in Senior's interest and against his expressed wishes, he sent Junior a letter on July 31, 2014, revoking the POA and demanding that Senior's truck be returned to him with title in Senior's name. Defendants' SMF ¶ 53; Hesseltine Aff. ¶ 7.[10] Senior also provided Hesseltine with a copy of the second letter sent to Junior, drafted by his attorney and dated July 31, 2014, that revoked the POA and demanded the return of Senior's truck and firearms. Defendants' SMF ¶ 54; Plaintiff's Amended Opposing SMF ¶ 54.

Senior gave Hesseltine a copy of Pease's August 6, 2014, letter to Junior demanding the return of Senior's truck and firearms and an accounting of the financial activities Junior undertook on Senior's behalf during the period the POA was in effect, including an explanation for the $3,000 worth of antiques Senior believed had been sold by Junior. *Id.* ¶ 55.[11] Fuller had provided Hesseltine a copy of the August 12, 2014, letter from Junior to Pease responding to Pease's August 6, 2014, demand letter. *Id.* ¶ 56.

On November 18, 2014, Senior came to the Waldoboro police station and reported that he had learned that Junior was planning to sell his truck. *Id.* ¶ 62. Hesseltine was able to locate an advertisement on Craiglist of Senior's truck for sale for $7,900. *Id.* ¶ 63. The seller's listed telephone number was Junior's cell phone number. *Id.*

---

[9] The plaintiff purports to deny this statement; however, his assertions do not controvert it. Plaintiff's Amended Opposing SMF ¶ 52.

[10] The plaintiff denies this statement to the extent that the defendants assert that the letter was sent on July 13, 2014. Plaintiff's Amended Opposing SMF ¶ 53. I have corrected this typographical error.

[11] My recitation incorporates the relevant portion of the plaintiff's qualification.

On the same day, November 18, 2014, Senior provided Hesseltine with a copy of a bill that he had received from AT&T Wireless for $305 for a cell phone account that had been opened in his name. *Id*. ¶ 66. The cell phone number on the account was that of Junior, although Senior was responsible for the bill because the account had been opened in his name. *Id*. ¶ 67.

On November 20, 2014, Hesseltine authored and filed in the Maine District Court in Wiscasset, Maine, an Affidavit and Request for Search Warrant for the residence of Junior, located in the Town of Standish, Maine, and any and all vehicles, boats and/or outbuildings on the premises, including but not limited to listed items of personal property claimed to belong to Senior and any financial documentation, to include bank records and receipts showing the disposition of Senior's claimed property. Stipulated Facts ¶ 24; *see also* Affidavit and Request for Search Warrant ("S.W. Aff.") (ECF No. 33-2), attached to Stipulated Record. Items sought to be seized included Senior's truck and his firearms. Defendants' SMF ¶ 70; Plaintiff's Amended Opposing SMF ¶ 70.

Before Hesseltine filed the affidavit and application in the Maine District Court, Labombarde reviewed it, and Hesseltine submitted it to Assistant District Attorney Andrew Wright for his review and approval. *Id*. ¶ 69. On the same day, a Maine District Court Judge granted the request. Stipulated Facts ¶ 25.

On November 21, 2014, Hesseltine, accompanied by Santheson and Maine State Police officers, executed a search of Junior's residence and property pursuant to the search warrant dated November 20, 2014. *Id*. ¶ 26. Junior was arrested without an arrest warrant at his residence in Standish, Maine, by Hesseltine. *Id*. ¶ 27. Hesseltine served Junior with a Uniform Summons and Complaint dated November 21, 2014, for violation of Title 17-A section 353.1A.2 Class B Theft by Unauthorized Taking/Transfer. *Id*. ¶ 28. Junior was transported to Two Bridges Jail by

Hesseltine and Santheson and released the same day on $5,000 unsecured bail with conditions of release pursuant to a bail bond. *Id.* ¶¶ 29-30.

Santheson had one prior encounter involving Senior and Junior when he was dispatched to a complaint by Senior that Junior had assaulted him on July 27, 2014. Defendants' SMF ¶ 106; Plaintiff's Amended Opposing SMF ¶ 106.[12] Santheson spoke to Junior by telephone, and Junior advised him that the dispute had begun with an argument over Junior's decision to re-register Senior's truck in his own name. *Id.* ¶ 108.[13] Because neither Senior nor Junior would give a statement to Santheson, and both indicated that they did not wish to press criminal charges, Santheson did no further investigation of any complaints that Senior may have had with Junior's use of the POA. Defendants' SMF ¶ 109; Affidavit of Andrew Santheson ("Santheson Aff.") (ECF No. 38-4), attached to Defendants' SMF, ¶¶ 22-23.[14]

The truck was in plain view when officers arrived at Junior's home to execute the search warrant, and Santheson already knew, from speaking to Junior in July 2014 following Senior's assault complaint, that Junior had the truck. Statement of Additional Material Facts in Support of Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Additional SMF"), commencing on page 32 of Plaintiff's Amended Opposing SMF, ¶ 86; Defendants' Reply Statement of Material Facts, etc. ("Defendants' Reply SMF") (ECF No. 61) ¶ 86. Hesseltine could see Senior's truck parked in Junior's driveway. Defendants' SMF ¶ 84; Plaintiff's Amended

---

[12] The plaintiff qualifies this statement, asserting that Santheson learned during his investigation that Senior was the aggressor and that Junior had not assaulted Senior. Plaintiff's Amended Opposing SMF ¶ 106; Narrative for Reserve Patrol Andrew Santheson dated August 1, 2014 ("Santheson Report"), Exh. L (ECF No. 52-12) to Plaintiff's Opposing Statement of Material Facts, etc. ("Plaintiff's Original Opposing SMF") (ECF No. 52), at Page ID # 1767.

[13] The plaintiff qualifies this statement, asserting that the decision to re-register the truck was mutual and that he also told Santheson that the truck was re-registered after he became his father's agent, his father's truck got better gas mileage than his, and he left his truck for the use of his father, who had a license restriction limiting him to driving in a 15-mile radius. Plaintiff's Amended Opposing SMF ¶ 108; Santheson Report at Page ID # 1768.

[14] The plaintiff purports to deny this statement; however, his assertions do not controvert it. Plaintiff's Amended Opposing SMF ¶ 109.

Opposing SMF ¶ 84. Junior was arrested because he was found in possession of the truck and guns; however, he had not tried to hide that fact, and it was known that he had them. Plaintiff's Additional SMF ¶ 96; Defendants' Reply SMF ¶ 96. Hesseltine would not have charged Junior with theft if he had given the truck and firearms back, but he never contacted Junior after he took over the investigation. *Id.* ¶ 97.[15]

Junior told Hesseltine that all of Senior's personal property had been sold and was not on the premises. Defendants' SMF ¶ 85; Plaintiff's Amended Opposing SMF ¶ 85. Hesseltine located the title to Senior's truck in the glove compartment, along with a bill of sale purportedly signed by Senior indicating that Senior had sold the truck to Junior. Defendants' SMF ¶ 86; Hesseltine Aff. ¶ 12.[16] When Hesseltine showed Senior the document indicating that he had voluntarily transferred ownership to Junior, Senior indicated that he had never signed such a document and that his signature had been forged by Junior. Defendants' SMF ¶ 87; Plaintiff's Amended Opposing SMF ¶ 87.

Hesseltine published to the media on November 25, 2014, shortly after Junior's arrest, that the WPD searched Junior's home and recovered items that led to his arrest, but would not say what items were recovered other than the gun. Plaintiff's Additional SMF ¶ 91; Defendants' Opposing SMF ¶ 91.

---

[15] I omit the plaintiff's further assertion that Hesseltine knew that "Junior already was willing to give the truck to Senior and get his truck from his father as he told Fuller[,]" Plaintiff's Additional SMF ¶ 97, which is not supported by the citations given. The cited materials indicate that Junior told Fuller that he would return the truck only on conditions.

[16] The plaintiff purports to deny that the bill of sale was "purportedly" signed by Senior; however, his assertion that the signature was in fact that of Senior, Plaintiff's Amended Opposing SMF ¶ 86, does not controvert the statement, which describes Hesseltine's observations. Even accepting at face value that Senior did sign the bill of sale, this fact is not outcome-determinative for the reasons discussed below.

Labombarde was quoted, on November 29, 2014, on the website privateofficer.com, in an article titled "Cumberland County Jail Employee Is Accused of Stealing from His Own Father," as stating that "the theft happened between May and August of this year." *Id.* ¶ 92.

After Junior's arrest, Hesseltine prepared an investigative report for the District Attorney's Office that was accompanied by all documents that he had received from Senior, Senior's hospital records from the period in which he signed the POA naming Junior as his agent, a written statement from Floyd Oliver attesting to Senior's observed confusion on the day he signed the POA, bank records for Senior and Junior that had been obtained by Grand Jury subpoena, receipts supplied by Junior as evidence of the disposition of Senior's money, and the POA and correspondence relating to the rescinding of the POA and demands for financial accounting involving Junior, Senior, and Pease that had been provided to Fuller in October 2014. Defendants' SMF ¶ 91; Hesseltine Aff. ¶ 13.[17]

Hesseltine's narrative report and investigative file, including all supporting materials, were turned over to the District Attorney's Office for its consideration of Senior's claim that Junior had used the POA to take actions that were not in Senior's interest and against his expressed directives and that Senior had been financially exploited by his son by the theft of his personal property and money. Defendants' SMF ¶ 92; Hesseltine Aff. ¶ 13.[18]

At the conclusion of his investigation, Hesseltine was called to testify before a Lincoln County Grand Jury convened by Wright. Defendants' SMF ¶ 93; Plaintiff's Amended Opposing SMF ¶ 93. Both Senior and Junior also testified before the Grand Jury. *Id.* ¶ 94. The District

---

[17] The plaintiff purports to deny this statement; however, his assertions that the statements of certain witnesses were not provided because they were not recorded and that Hesseltine's narrative fails to mention certain facts do not controvert it. Plaintiff's Amended Opposing SMF ¶ 91.
[18] The plaintiff purports to deny this statement; however, his assertions that the statements of certain witnesses were not provided because they were not recorded and that Hesseltine's narrative fails to mention certain facts do not controvert it. Plaintiff's Amended Opposing SMF ¶ 92.

Attorney used the POA when questioning Hesseltine during his Grand Jury testimony. *Id.* ¶ 95. During his Grand Jury testimony, Junior was able to explain that the POA was drafted by Senior's attorney and not by him and that the reason he refused to return Senior's firearms was because he thought his father might be suicidal. *Id.* ¶ 96. During his Grand Jury testimony, Junior admitted that he had placed Senior's truck up for sale on Craigslist. *Id.* ¶ 97.

On March 10, 2015, the Grand Jury returned a five-count indictment against Junior in the matter *State of Maine v. Scott Jordan, Jr.*, Lincoln County Superior Court, Docket No. CR-14-406, for three counts of violation of 17-A M.R.S.A. § 353(1)(B)(2), Theft by Unauthorized Taking, Class B, one count of violation of 17-A M.R.S.A. § 353(1)(B)(1), Theft by Unauthorized Taking, Class B, and one count of violation of 17-A M.R.S.A. § 358(1)(B)(1), Theft by Misapplication of Property, Class B. Stipulated Facts ¶ 31.

After the Grand Jury returned its indictment on March 10, 2015, Hesseltine responded to media requests about the case, describing it as a case of "elder abuse" based on his knowledge that the Grand Jury had found probable cause to believe Junior had committed theft and financial exploitation of his elderly father. Defendants' SMF ¶ 99; Plaintiff's Amended Opposing SMF ¶ 99.

In addition, after the indictment had been returned, Labombarde responded to media requests about the case, describing it as a case of "elder abuse" based on his knowledge that the Grand Jury had found probable cause to believe that Junior had committed theft of property and misappropriation of money that belonged to his elderly father. Defendants' SMF ¶ 100; Affidavit

of Chief William Labombarde ("Labombarde Aff.") (ECF No. 38-1), attached to Defendants' SMF, ¶ 6.[19]

Senior died on or about September 1, 2015. Stipulated Facts ¶ 34. On September 14, 2015, the criminal proceedings against Junior were dismissed by the Lincoln County District Attorney's Office pursuant to M. R. Crim. P. 48(a) with the stated reason for the dismissal: "[X]Other The victim and key witness in the case for the State, Scott Jordan Sr, has died[.]" *Id.* ¶ 35.

Junior was unable to see his ill father due to bail conditions, and Senior died without Junior being there. Plaintiff's Additional SMF ¶ 74; Defendants' Reply SMF ¶ 74. Any possible relationship between Junior and Senior at the end of Senior's life was destroyed due to Junior's arrest and prosecution. Plaintiff's Additional SMF ¶ 75; Plaintiff Scott Jordan, Jr.'s Answers to Defendants' First Set of Interrogatories to Plaintiff Scott Jordan, Jr. (ECF No. 38-13), attached to Defendants' SMF, ¶ 16, at Page ID # 826.[20]

The only liability coverage available to the Town of Waldoboro and its employees in the action brought by the plaintiff is the limited liability coverage provided as a result of the Town's membership in the Maine Municipal Association Property & Casualty Pool, a self-insured municipal risk pool. Defendants' SMF ¶ 103; Plaintiff's Amended Opposing SMF ¶ 103. Limited liability coverage for state law claims is provided in those areas where the Town and its employees do not enjoy immunity under the Maine Tort Claims Act, as described in the Member Coverage Certificate. *Id.* ¶ 104.

---

[19] The plaintiff purports to deny this statement; however, his assertion that Labombarde called this "a case of elder abuse" as quoted in the Portland Press Herald on November 25, 2014, nearly four months before the return of the indictment, does not controvert it. Plaintiff's Amended Opposing SMF ¶ 100. In any event, even accepting that assertion at face value, it is not outcome-determinative for the reasons discussed below.
[20] I have omitted the plaintiff's characterization of his arrest and prosecution as "unlawful," sustaining the defendants' objection that this is a legal characterization, not an assertion of fact. Defendants' Reply SMF ¶ 75.

### B. Facts Taken at Face Value

Even accepting at face value a number of the plaintiff's asserted facts, they are not outcome-determinative. The majority of these facts bear on the defendant officers' failure, prior to seeking a warrant to search the plaintiff's home or placing him under arrest, to verify Senior's allegations and take into account evidence bearing negatively on Senior's credibility and positively on that of the plaintiff. *See, e.g.*, Plaintiff's Additional SMF ¶¶ 43, 67 (Hesseltine failed to verify Senior's information despite Senior's known credibility problems).[21]

As a matter of law, these asserted facts are not outcome-determinative because, as the defendants note, *see* Defendants' Reply Memorandum in Support of Motion for Summary Judgment ("Reply") (ECF No. 60) at 5-6, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts[,]" *District of Columbia. v. Wesby*, 138 S. Ct. 577, 588 (2018). *See also, e.g., Cox v. Hainey*, 391 F.3d 25, 32 n.2, 34 (1st Cir. 2004) (noting that "[a] reasonable police officer is not required to credit a suspect's story" and that "the practical

---

[21] *See also, e.g.,* Plaintiff's Additional SMF ¶¶ 28-29, 32, 66 (WPD knew Senior had falsely complained on July 27, 2014, that Junior assaulted him when, in fact, he had assaulted Junior), 36, 60 (prior to his hospitalization, Senior discussed yard sale with Junior, and Junior did not understand the yard sale to be dependent on Senior's availability to be there), 42, 98-99, 115 (Junior told Fuller on October 17, 2014, that Senior had stolen his property and was refusing to return it; Hesseltine denied knowing this prior to Junior's arrest but claimed it would be relevant as a reason why Junior did not return Senior's property, and Labombarde testified that, had this been known, they "would probably take a harder look at it and have a different conversation with the district attorney's office" regarding Senior's complaint against Junior), 45 (WPD had copy of Junior's August 12, 2014, letter to Pease stating that Senior had threatened to do whatever it took to punish Junior), 49 (Fuller knew that Junior had Senior's truck and was helping his father do work on the house and that it was more reasonable for Junior to drive Senior's truck back and forth because it got better gas mileage than Junior's truck), 72-73 (Senior signed a document dated June 12, 2014, gifting his truck to Junior, and, per Junior, the signature on that document is Senior's), 50-51 (Fuller agreed that, if it were verified that Senior was suicidal and had mental stability issues, that would justify Junior in not returning his guns), 68-70 (Junior could not send a financial accounting to Pease because, after he offered to send it, Senior dropped him as his attorney), 108-14 (prior to Junior's indictment, Hesseltine investigated Junior's complaint, initially made to Fuller, that Senior had stolen his property and threatened to report a witness, Terry Colson, to the Maine Department of Health and Human Services if Colson testified against him in Junior's case; Colson verified the threat, and Senior claimed that he took the property for leverage to get his property back from his son, yet Hesseltine did not charge Senior after Senior returned Junior's property at Hesseltine's direction and did not disclose his report of this investigation to the Grand Jury; Labombarde admits that, if WPD had this information, it should have been disclosed in the search warrant application), 117, 119-21 (Hesseltine interviewed witnesses both before and after Junior's arrest who called into question Senior's credibility and/or corroborated Junior's version of events; Hesseltine failed to ask pertinent questions of Colson).

restraints on police in the field are greater with respect to ascertaining intent and, therefore, the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great").

For the reasons discussed below, the following categories of evidence also are not outcome-determinative: (i) whether Senior was competent to execute the POA, *see* Plaintiff's Additional SMF ¶¶ 2-4, 30, 59, 62, 119, (ii) whether Hesseltine and other officers crossed the threshold of Junior's home to place him under immediate arrest prior to conducting a search pursuant to the warrant, *see id.* ¶¶ 16-25, (iii) Hesseltine's subjective state of mind in determining whether and at what point he had probable cause to arrest the plaintiff, *see id.* ¶¶ 5-8, and (iv) statements that Hesseltine made to the plaintiff's employer, *see id.* ¶ 122.

In taking these facts into consideration in determining whether the defendants have demonstrated their entitlement to summary judgment, I have not reached the merits of any requests by the defendants to strike them or determined whether, if denied, they are supported by the citations given.

### III. Discussion

#### A. Unlawful Search & Seizure (Counts I-VI) (All Defendants)

The plaintiff alleges in Counts I and IV of his complaint, brought pursuant to the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. § 4682, and 42 U.S.C. § 1983, respectively, that the individual defendants (Labombarde, Hesseltine, Fuller, and Santheson) violated both his Maine constitutional rights and his rights pursuant to the Fourth and Fourteenth amendments to the United States Constitution when they conducted an unlawful search of his home and seizure of his property pursuant to a search warrant obtained through falsehoods and omissions that undermined probable cause for the search. *See* Operative Complaint ¶¶ 73-82, 94-103.

He alleges in Counts II, III, V, and VI, also brought pursuant to the MCRA and section 1983, that the Town and/or Labombarde are liable for those constitutional violations based on inadequate training, supervision, and/or discipline of the Town's police officers and the Town's unconstitutional or grossly negligent policies, pattern of conduct, customs, practices, and/or procedures. *See id*. ¶¶ 83-93, 104-14.

The defendants seek summary judgment as to all six counts on the basis that there is no triable issue that the search warrant was unsupported by probable cause. *See* Motion at 4-9, 26. In the alternative, they argue that (i) Hesseltine, the author of the affidavit submitted in support of the warrant application, is entitled to qualified immunity,[22] (ii) Santheson, Fuller, and Labombarde are entitled to summary judgment because they had no role, or a minimal role, in procuring the warrant or conducting the search, and (iii) the plaintiff fails to make out a triable issue of deliberate indifference on the part of the Town or of Labombarde, acting in his supervisory capacity. *See* Motion at 9-13, 26-30. I find the first point dispositive in the defendants' favor and, hence, need not and do not reach their remaining points.

### 1. Applicable Legal Standard

As a threshold matter, as the plaintiff acknowledges, section 1983 claims for unlawful search and seizure are properly analyzed solely pursuant to the Fourth Amendment. *See* Motion at 4; Opposition to Defendants['] Motion for Summary Judgment ("Opposition") (ECF No. 51) at

---

[22] "Because exposure to civil rights suits may result in distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service, the doctrine of qualified immunity protects public officials from liability under § 1983 so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Burke v. Town of Walpole*, 405 F.3d 66, 76-77 (1st Cir. 2005) (citation and internal quotation marks omitted). "The doctrine thus protects all but the plainly incompetent or those who knowingly violate the law." *Id*. at 77 (citation and internal quotation marks omitted). "The qualified immunity analysis consists of three inquiries: (i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." *Id*. (citation, internal quotation marks, and footnote omitted).

2-3; Reply at 3 n.5; *Albright v. Oliver*, 510 U.S. 266, 274 (1994) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

In turn, analysis of the plaintiff's Fourth Amendment claims of unlawful search and seizure pursuant to section 1983 is dispositive of his parallel Maine constitutional claims pursuant to the MCRA. *See, e.g., Jackson v. Town of Waldoboro*, 751 F.Supp.2d 263, 275 (D. Me. 2010) ("The MCRA, which provides a general remedy for violations of federal and state constitutional and statutory rights, is 'patterned' after Section 1983. As such, disposition of a claim under Section 1983 controls a claim brought under MCRA.") (citations omitted).

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To satisfy this standard, an application for a search warrant must demonstrate probable cause to believe that (i) "a crime has been committed" (the "commission" element) and (ii) "enumerated evidence of the offense will be found at the place to be searched" (the "nexus" element). *United States v. Cordero-Rosario*, 786 F.3d 64, 69 (1st Cir. 2015) (citations and internal quotation marks omitted). "The task of the issuing magistrate is . . . to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

When reviewing a magistrate's probable cause finding, the reviewing court gives "significant deference" to the magistrate's initial evaluation, and relief is warranted only if there is "no substantial basis" for the probable cause finding. *Cordero*, 786 F.3d at 69 (citation and internal quotation marks omitted). Probable cause is assessed in light of the totality of the

circumstances contained in the search warrant affidavit, and is to be evaluated in light of "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 230-31 (citation and internal quotation marks omitted).

"[T]o show that a magistrate's facially valid probable cause determination was constitutionally unacceptable, the moving party must demonstrate that the police officer submitted to the magistrate evidence that was not 'believed or appropriately accepted by the [officer] as true.'" *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013) (quoting *Franks v. Delaware*, 438 U.S. 154, 165 (1978)). Because this requirement flows from the "'language of the Warrant Clause itself, which surely takes the affiant's good faith as its premise[,]' . . . the magistrate's probable cause determination must not have relied upon evidence an officer submitted in bad faith." *Id*. (quoting *Franks*, 438 U.S. at 164).

"*Franks,* however, did not establish strict liability for police officers." *Id*. at 102. "To show that the evidence presented to the magistrate was not 'truthful' in the *Franks* sense, '[a]llegations of [police] negligence or innocent mistake are insufficient.'" *Id*. (quoting *Franks,* 438 U.S. at 171). "Rather, the plaintiff must demonstrate that law enforcement officers made statements in the warrant affidavit which amounted to 'deliberate falsehood or . . . reckless disregard for the truth,' *and* that those deliberate falsehoods were necessary to the magistrate's probable cause determination." *Id*. (quoting *Franks*, 438 U.S. at 171) (emphasis in original).

"Reckless disregard for the truth in the submission of a warrant application may be established where an officer in fact entertained serious doubts as to the truth of the allegations or where circumstances evince[ed] obvious reasons to doubt the veracity of the allegations in the application." *Burke*, 405 F.3d at 81 (citation and internal quotation marks omitted).

In addition, "the intentional or reckless omission of material exculpatory facts from information presented to a magistrate may also amount to a Fourth Amendment violation." *Id*. In that context, "recklessness may be inferred where the omitted information was critical to the probable cause determination." *Id*. at 81-82 (citation and internal quotation marks omitted).

In order to determine the materiality of alleged misstatements or omissions, courts "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Id*. at 82. (citation and internal quotation marks omitted).

## 2. Analysis

The defendants seek summary judgment on the basis that the plaintiff cannot demonstrate, as a matter of law, the materiality of omissions to disclose that (i) the POA contained language conferring broad powers on the plaintiff, (ii) the plaintiff explained that he declined to return Senior's firearms because he believed that Senior was suicidal, and, (iii) in a July 2014 incident during which police responded to Senior's report that the plaintiff had assaulted him, the plaintiff reported that Senior had stolen his personal property and refused to return it. *See* Motion at 6-9; Operative Complaint ¶¶ 47-49.

The plaintiff disagrees, cataloguing omissions and misstatements affecting nine paragraphs of the search warrant affidavit. *See* Opposition at 4-9. I conclude that, even construing the evidence in the light most favorable to the plaintiff, his showing fails to meet the *Franks* standard.

### a. Allegations of Complaint

**Omission of POA Language**. The plaintiff alleges that Hesseltine should have appended the POA to his warrant application or otherwise informed the court that the POA included language that the plaintiff had the "full power and authority to deal with all of his father's property,"

including the authority to convey Senior's property to himself or for his benefit. Operative Complaint ¶ 48.[23]

As the defendants observe, *see* Motion at 7, Hesseltine did disclose that Senior had granted the plaintiff a POA, *see* S.W. Aff. at Page ID # 417. They persuasively argue that, even assuming the validity of that instrument, the omission of the language at issue was not material to the determination of probable cause because the plaintiff owed his father duties beyond those set forth within its four corners. *See* Motion at 7-8.

The Maine Uniform Power of Attorney Act provides:

> Notwithstanding provisions in the power of attorney, an agent that has accepted appointment shall . . . [a]ct in accordance with the principal's reasonable expectations to the extent actually known by the agent and otherwise act as a fiduciary under the standards of care applicable to trustees as described under Title 18-B, sections 802 to 807 and Title 18-B, chapter 9.

18-A M.R.S.A. § 5-914(a)(1). Those standards of care include the duty of loyalty. *See* 18-B M.R.S.A. § 802. The inclusion of any specific language in the POA, therefore, was not dispositive of the question of whether the plaintiff had breached his fiduciary duties as his father's agent and, more to the point, committed a theft under Maine law.

The plaintiff rejoins that everything that he did was in accordance with Senior's reasonable expectations to the extent known to him because, as Hesseltine well knew, he and Senior had

---

[23] The POA provided Senior's agent with "full power to administer [Senior's] personal and business affairs and to deal with all of [his] property[.]" POA, Exh. 1 (ECF No. 33-1) to Stipulated Record (ECF No. 33), at Page ID # 411. The POA gave the agent the power, *inter alia*, "[t]o make gifts of any property . . . as [Senior's] agent may consider advisable or appropriate, which gifts may be made to or for the benefit of [Senior's] agent, . . . whether or not any such gift is consistent with any prior giving pattern of [Senior's] or with any will or testamentary substitute executed by me before or after the date hereof." *Id.* at Page ID # 412-13. The POA stated that Senior ratified and confirmed, and "promise[d] at all times to ratify and confirm all and whatsoever my agent, shall lawfully do or cause to be done in and about the premises by virtue of these presents[,]" prior to such time as notification of revocation reached his agent. *Id.* at Page ID # 414.

agreed that he would sell some of Senior's property, fix up Senior's house in order to sell or rent it, and then have Senior move in with him.  *See* Opposition at 7-8.

He adds that, in any event, section 5-914(b)(1) provides, "*Except as otherwise provided* in the power of attorney, an agent that has accepted appointment shall . . . [a]ct loyally for the principal's benefit[.]"  *Id.* at 8 (quoting 18-A M.R.S.A. § 5-914(b)(1), mistakenly referred to as 18-A M.R.S.A. §5-519(b)(1) (emphasis added by plaintiff).  He notes that the POA under which he acted clearly provided for self-dealing by the agent.  *See id.*; *see also* POA at Page ID #412-13.

Finally, he argues that, to the extent that he breached any duties as an agent, the remedy was civil, not criminal.  *See* Opposition at 8; 18-A M.R.S.A. § 5-917 (agent must restore value of principal's property to what it would have been absent violation and reimburse principal, or principal's successors in interest, attorney's fees and costs paid on agent's behalf).

The plaintiff's first point is unavailing because the fact that he and his father had initially agreed on a plan is immaterial in the totality of the circumstances.   It is undisputed that Senior changed his mind about moving in with the plaintiff and eventually revoked the POA.  Officers had evidence that both before and after the revocation of the POA, the plaintiff had not acted in accordance with his father's reasonable expectations to the extent known to him and refused to return his father's firearms or truck despite repeated requests.  This evidence included that, (i) despite Senior's insistence that the plaintiff not sell Senior's antiques while Senior remained hospitalized, the plaintiff did precisely that, (ii) despite Senior's instructions, the plaintiff failed to use money from the sale of Senior's property to pay a $1,500 tax bill, and (iii) the plaintiff refused to return his father's truck unconditionally and with title restored to Senior, ultimately listing it for sale on Craigslist.  To the extent that the plaintiff assails Senior's credibility and offers innocent explanations for his own conduct, *see, e.g.*, Opposition at 7-8, that does not undermine probable

cause, *see, e.g., Wesby*, 138 S. Ct. at 588 ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts.").

The second point is unavailing because subsection 5-914(b)(1) cannot reasonably be read to undermine the commandments of subsection 5-914(a), which applies "[n]otwithstanding provisions in the power of attorney[.]" 18-A M.R.S.A. § 5-914(a). Pursuant to subsection (a), the plaintiff had a duty to "[a]ct in accordance with [Senior's] reasonable expectations to the extent actually known by [him] . . . ." *Id.* § 5-914(a)(1).

Finally, the third point is unavailing because nothing in section 5-917 purports to address, let alone preclude, the imposition of criminal liability stemming from an agent's misuse of a power of attorney. *See* 18-A M.R.S.A. § 5-917. Indeed, the Uniform Comment to the statute explains that section 5-917 "does not . . . limit the agent's liability exposure to these amounts" and that "an agent may face additional civil or criminal liability." *Id.* (unif. cmt.).

**Omission of Evidence Regarding Firearms**. The plaintiff alleges that Hesseltine omitted the material fact of his explanation, in his August 12, 2014, letter to Senior's lawyer Pease, that he could not return guns to his father because his father was suicidal and living with a person (Colson) who was subject to a temporary protection from abuse order and could not have firearms. *See* Operative Complaint ¶ 49. He adds that Hesseltine knew, but omitted to disclose, that he offered to give the guns to the WPD, which refused to take them, a fact that he asserts demonstrates that he had no intention either to keep the guns or, as required to be guilty of the crime of theft, to deprive his father of them. *See* Opposition at 6, 8; 17-A M.R.S.A. § 353(1)(A).

As the defendants observe, *see* Motion at 8, Hesseltine did disclose that the plaintiff claimed that he had refused to return Senior's guns because Senior was suicidal, *see* S.W. Aff. at Page ID # 417. The additional undisclosed facts are not materially exculpatory. That the plaintiff

had provided a second explanation for his refusal to return the guns and offered to turn them over to the WPD, which declined to accept them, did not demonstrate, as he argues, that he lacked the *mens rea* to have committed theft of the guns, and, in the totality of the circumstances, does not undermine probable cause to believe that he had done so.

**Omission of Evidence of July 2014 Incident.** The plaintiff alleges that Hesseltine omitted to disclose information material to the credibility of Senior, including Senior's claim in July 2014 that the plaintiff had assaulted him when, in fact, Senior had assaulted the plaintiff. *See* Operative Complaint ¶¶ 47, 49. The plaintiff contends that the July 2014 incident was critical to the calculation of whether probable cause existed, and should have been included in the search warrant affidavit, because the fact that Senior made an earlier false claim against him was directly related to the credibility of the claim that led to the issuance of the search warrant. *See* Opposition at 8. As the defendants note, *see* Motion at 8-9, neither the plaintiff nor Senior pressed charges or gave a statement related to the July 2014 incident. Even accepting, at face value, that officers knew Senior had falsely accused the plaintiff of assaulting him, they had evidence that the plaintiff had taken Senior's property and refused to return it. In the totality of the circumstances, the omission of the July 2014 incident was not material to the determination of whether there was probable cause to believe that the plaintiff had stolen property from Senior.

### b. Affected Paragraphs of Search Warrant Affidavit

In his opposing brief, the plaintiff identifies asserted omissions and a misleading statement affecting nine of 17 paragraphs of the search warrant affidavit. *See* Opposition at 4-7; S.W. Aff.

at Page ID ## 417-18.[24]   However, for the reasons that follow, I find them immaterial to whether the affidavit conferred probable cause for the search and seizure:

1.     **Paragraphs 1 and 2:** "On May 12th, 2014[,] [Senior] was admitted to Penbay Medical Center.  On May 15th, 2014[,] [Junior] presented [Senior] with paperwork requesting he appoint himself as his father's Financial Power of Attorney." S.W Aff. at Page ID # 417.

The plaintiff contends that Hesseltine knowingly omitted the fact that Senior's sister, Raeberta Myers, had told Hesseltine and Labombarde in an undocumented interview in the fall of 2014 that, before Senior was hospitalized on May 12, 2014, he told her that he was giving Junior a POA and that, when she asked Senior a number of times whether he was sure that this was what he wanted, he assured her each time that it was.  *See* Opposition at 5.  Whether Senior wished to, and was competent to, appoint the plaintiff as his agent at the time of the execution of the POA is immaterial for the reasons discussed above.

2.     **Paragraph 3: "**On May 15th, 2014[,] [Senior] signed Financial Power of Attorney granting appointment to [Junior]."  S.W. Aff. at Page ID # 417.

The plaintiff argues that Hesseltine omitted the fact that "the POA was validly executed under Maine law in front of an independent Notary Public, Elizabeth Hilchey, and a witness, Kylie

---

[24] Statements in the search warrant affidavit that the plaintiff does not contest for *Franks* purposes include that, (i) during an 11-day period when Senior was rehospitalized, Junior "sold off many of [Senior's] Antiques and personal belongings[,]" including a trailer that sold for $2,000, and Junior failed to pay $1,500 in property taxes "as instructed/requested by [Senior][,]" (ii) during the time that Senior was hospitalized in June and July 2014, he would have had direct deposits of $2,002 from Social Security and $106 from the Veterans Administration plus any other money from the sale of his antiques and personal property, (iii) Senior sent Junior a notice on July 31, 2014, revoking the POA, (iv) Senior reported that, in October 2014, he received a bill for $305.70 from AT&T Wireless listing Junior's cell phone number, he and his son had gone to AT&T Wireless to talk about getting on the same cell phone plan, but he did not agree to the terms AT&T was offering and declined the offer, he did not authorize the account to be activated, and AT&T Wireless refused to allow him to deactivate the account because Junior was also listed on it, and (v) in November 2014 Senior reported that he heard a rumor that Junior was trying to sell the 2003 Chevrolet, and on November 19 Hesseltine was made aware by a co-worker that the 2003 Chevrolet 2500 was for sale on Craiglist in Standish for $7,900, researched the ad, and found that the contact phone number was that of Junior and that the ad had been listed for eight days.  S.W. Aff. at Page ID ## 417-18.

Wadsworth[,]" and that "Hesseltine contacted Wadsworth but did not document the interview." Opposition at 5. This evidence is immaterial for the reasons discussed above.

3.    **Paragraph 4:** "[Senior] remained in the Hospital . . . for the next 10 days. Over the course of these 10 days he and his son talked about his personal property including many antiques from an antique business [Senior] operates from his residence. [Junior] was setting up a sale for many of these items. [Senior] insisted the sale take place after he was released from the hospital as [Junior] was not familiar with the value of the antiques." Hesseltine Aff. at Page ID # 417.

The plaintiff asserts that Hesseltine knowingly omitted the fact that he and Senior had agreed, prior to Senior's hospitalization, to move together to a place to be rented in Standish and, in anticipation of that move, the plaintiff was to fix up Senior's home in Waldoboro for sale or rent and sell some of Senior's personal property. *See* Opposition at 5. The omitted information is immaterial. Regardless of whether the two had a plan, Senior claimed that the plaintiff ignored specific instructions for the disposition of his antiques.

4.    **Paragraph 8:** "Acting as Power of Attorney, [Junior] signed over to himself [Senior's] 2003 Chevrolet Pick-up Truck and registered it under his own name. [Junior] left [Senior] with his 2001 Ford Super Duty F-350 Truck. [Junior] refuses to return [Senior's] truck after many requests from [Senior]." S.W. Aff. at Page ID # 417.

The plaintiff argues that this statement is misleading because of Hesseltine's failure to disclose that (i) the plaintiff and Senior had agreed that he should transfer title to the truck to himself for multiple reasons, including to shield Senior's assets from any debt collection by the hospital, and (ii) the plaintiff had left his own truck for his father's use and had used his father's truck because it got better gas mileage when he was commuting back and forth from Waldoboro

to Standish to care for him, visit him at the hospital, and fix and clean out his house for the move. *See* Opposition at 5-6. This omitted evidence, again, is immaterial. Officers were not obliged to rule out the plaintiff's explanations for suspicious facts. *See, e.g., Wesby*, 138 S. Ct. at 588.

5. **Paragraph 9:** "Acting as Power of Attorney, [Junior] removed 3 firearms from [Senior's] residence, and refuses to return them after many requests from [Senior] claiming [Senior] is suicidal." S.W. Aff. at Page ID # 417.

The plaintiff contends that this statement was deliberately false and misleading because Hesseltine knew that he had no intent to deprive Senior permanently of the guns, an element of the alleged crime of theft, 17-A M.R.S.A. § 353, given that he had explained why he did not return the guns and offered to turn them over to the WPD, which refused to take them. *See* Opposition at 6, 8. This omitted information is immaterial for the reasons discussed above.

6. **Paragraph 11:** "[Senior] was regaining his health and began to question things and felt [Junior] was not acting in his best interest but, was doing things to his own benefit. [Senior] reported he was missing 3 firearms, a 12-G[au]ge Pump Shotgun, single shot 410 Shotgun, and a 22 Caliber 9 shot Revolver. Other Property includes: Craftsman Electric Drill, Craftsman Skill Saw, Craftsman Chop Saw, Craftsman ½ inch socket set, 1 pair of Aluminum saw horses, 1 handmade unfinished wooden doll house w/garage, 1 electric belt knife and tool sharpener, 3 2-Gallon Tubs of Textured ceiling paint, 1 Window Air Conditioning Unit, pair of Binoculars, 3 television sets, Electric Can Opener, Outdoor gas cooker w/3 propane tanks, Vegetable Steamer, 1 Piece of Disney Artwork." S.W. Aff. at Page ID # 418.

The plaintiff contends that Hesseltine knew that there was a yard sale in which many items were sold in anticipation of the plan of father and son moving in together and that Junior had

possession of the three firearms that the WPD would not take. *See* Opposition at 6. These points are cumulative of others made above, and the same result obtains here.

7. **Paragraph 12:** "Approx. a week after his release from the hospital [Senior] drove [Junior's] 2001 Ford Super Duty F-350 to Standish to confront him and requested his truck and his Rockland Savings and Loan debit card. [Junior] refused to return the 2003 Chevrolet truck to [Senior]. [Junior] did return the debit card to [Senior]. [Senior] drove back to Waldoboro in the 2001 Ford Super Duty and went to Rockland Savings and Loan to check the balance of his checking account. [Senior] was told by bank staff there was a balance of $38.00 in his checking account." S.W. Aff. at Page ID # 418.

The plaintiff asserts that Hesseltine had no bank records to corroborate Senior's statements, as those records were secured after the execution of the search, and that Hesseltine knowingly failed to disclose that the plaintiff had supplied to the WPD receipts for work done on behalf of Senior to fix up Senior's house and truck as well as gas expenses incurred on behalf of Senior. *See* Opposition at 6-7. The omitted evidence is not materially exculpatory. The plaintiff does not assert that, had Hesseltine sought to verify Senior's statements concerning the bank records, he would have learned that Senior's representation that he was informed that he had only $38 left in his bank account was false. *See id.* That the plaintiff had receipts for expenditures made on his father's behalf was not dispositive of the question of whether he had committed a theft of Senior's property, including Senior's truck. Hesseltine was not required "to rule out [the plaintiff's] innocent explanation for suspicious facts." *Wesby*, 138 S. Ct. at 588.

8. **Paragraph 14:** "On August 6th[,] 2014[,] [Senior's] Attorney, Willard Pease[,] sent [Junior] a letter requesting financial accounting activities including an explanation of approx. $3000.00 from the sale of Antiques. [Junior] sent a letter to Attorney Pease dated August 12th,

2014[,] refusing to supply financial details. [Junior] did state in this letter he would return . . . the 2003 Chevrolet to his father only after [Senior] repaired the AC Unit on the 2001 Ford, which was inoperable before he left it with his father." S.W. Aff. at Page ID # 418.

The plaintiff argues that Hesseltine's description of his letter is false and misleading in that he did not refuse to supply the requested information. *See* Opposition at 7. However, Hesseltine's characterization of the August 12 letter is not materially misleading. The plaintiff points out that he informed Pease that he would "gladly provide" the requested accounting, which Pease had not indicated was due until September 1, 2014. *Id.* (quoting letter dated August 12, 2014, from plaintiff to Pease ("Letter to Pease") (ECF No. 33-40), attached to Stipulated Record, at Page ID ## 667-68).

However, the plaintiff also (i) stated at the outset of his letter that he would "not provide accounting information of anything until I can confirm you are already aware of [Senior's] email and threats[,]" (ii) contested the necessity of the accounting in view of his asserted expenditures on his father's behalf totaling more than the $3,000 at issue, and (iii) concluded with, "Please respond in writing if you still wish to proceed and I will gladly provide you with the accounting transactions you requested." Letter to Pease at Page ID ## 666-68. Thus, while the plaintiff did not unconditionally refuse to provide the accounting, he refused to provide it at that time.

For all of these reasons, the plaintiff fails to demonstrate the existence of a triable issue that the search and seizure was performed without probable cause, violating his constitutional rights.

As the defendants note, *see* Motion at 25-26, 31, the absence of an underlying constitutional violation by an officer is fatal both to the plaintiff's claims of supervisory and municipal liability, *see, e.g., Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002) ("If . . . the officer has inflicted

no constitutional harm, neither the municipality nor the supervisor can be held liable."), and his claims that the defendants conspired to deprive him of his constitutional rights, *see, e.g., Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001) ("In order to make out an actionable conspiracy under section 1983, a plaintiff has to prove not only a conspiratorial agreement but also an actual abridgment of some federally-secured right.").

The defendants, accordingly, are entitled to summary judgment as to Counts I through VI of the complaint.

### B. False Arrest (Counts VII-XII) (All Defendants)

In Counts VII through XII of his complaint, again brought pursuant to the MCRA and section 1983, the plaintiff alleges that the individual defendants unlawfully arrested him or caused his arrest on November 21, 2014, without probable cause or a warrant in violation of both his Maine constitutional rights and his rights pursuant to the Fourth and Fourteenth amendments to the United States Constitution (Counts VII, X) and that the Town and Labombarde have municipal and supervisory liability, respectively, for those violations (Counts VIII-IX, XI-XII). *See* Operative Complaint ¶¶ 115-56.

The defendants seek summary judgment as to all six counts on the basis that there is no triable issue that the plaintiff was unlawfully arrested. *See* Motion at 16-17, 26. In the alternative, they argue that (i) Hesseltine and Santheson are entitled to qualified immunity, (ii) Labombarde and Fuller cannot be held liable because they never seized the plaintiff, and (iii) the plaintiff fails to make out a triable issue of deliberate indifference on the part of the Town or of Labombarde, acting in his supervisory capacity. *See id.* at 9-13, 26-30. I find the first point dispositive in the defendants' favor and, hence, need not and do not reach their remaining points.

### 1. Applicable Legal Standard

As a threshold matter, as the plaintiff acknowledges, section 1983 claims for false arrest are properly analyzed solely pursuant to the Fourth Amendment. *See* Motion at 4; Opposition at 12-13; Reply at 3 n.5; *Albright*, 510 U.S. at 274. In turn, analysis of the plaintiff's Fourth Amendment claims of false arrest pursuant to section 1983 is dispositive of his parallel Maine constitutional claims pursuant to the MCRA. *See, e.g., Jackson*, 751 F. Supp.2d at 275.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. "[A] warrantless arrest by a law enforcement officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

Probable cause to effectuate an arrest "exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been or is about to be committed and that the suspect is implicated in its commission." *United States v. Flores*, 888 F.3d 537, 543 (1st Cir. 2018) (citation and internal quotation marks omitted). "Probable cause must be assessed on the basis of the totality of the circumstances." *Id.* "Probable cause is not a high bar" and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586 (citations and internal quotation marks omitted).

The test of whether probable cause exists is an objective one: "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck*, 543 U.S. at 153. "That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.*

In Maine, a police officer may make a warrantless arrest if he or she has probable cause to believe that a person has committed or is committing a Class B crime. *See* 17-A M.R.S.A. § 15(1)(A)(2). A person is guilty of a Class B crime of theft by unauthorized transfer or taking if he or she "obtains or exercises unauthorized control over the property of another with intent to deprive the other person of the property" and the property's value is more than $10,000. 17-A M.R.S.A. § 353(1)(A) & (B)(1).

## 2. Analysis

The parties dispute whether the plaintiff was immediately arrested, as he contends, or initially detained for officer safety pending the search and only formally arrested at its conclusion, as the defendants argue. *See* Opposition at 13-16; Reply at 4-5. They also dispute whether Hesseltine crossed the threshold of the plaintiff's door to arrest him, as the plaintiff asserts, or detained him as he stood outside on his porch, as the defendants maintain. *See id.* Nonetheless, as the defendants argue, *see* Reply at 4-8, even accepting the plaintiff's version of these events, there is no triable issue of false arrest.

The plaintiff contests the defendants' bid for summary judgment as to his false arrest claims on the bases that: (i) officers made an unlawful warrantless, nonconsensual entry into his home to effectuate his arrest in the absence of exigent circumstances, a proposition for which he cites *Payton v. New York*, 445 U.S. 573, 590 (1980), (ii) while the defendants claim they had probable cause to arrest him based on the discovery of property valued at more than $10,000, he was arrested only for theft of the firearms in violation of "17-A M.R.S.A. §353.1A2 class B," a statute that does not even exist, and, (iii) in any event, officers lacked probable cause to arrest him, having relied on unverified statements of Senior "[d]espite the obvious questions that would be raised as to Senior's claims of theft by misuse of the POA based on the information known to the WPD[,]" a

proposition for which he cites *Thompson v. City of Portland*, 620 F. Supp. 482, 487 (1985). *See* Opposition at 13-14, 16-22.

With respect to the first point, as the defendants rejoin, *see* Reply at 5 n.7, *Payton* is distinguishable in that the police in that case had obtained neither search nor arrest warrants, *see Payton*, 445 U.S. at 576-83; *United States v. Winchenbach*, 197 F.3d 548, 553-54 (1st Cir. 1999) (distinguishing *Payton* in holding that, "once the police gain lawful entry to residential premises (as by a search warrant), an immediate arrest is permissible without a separate arrest warrant as long as evidence known to the officers before the search supplies probable cause for the arrest") (footnote omitted). While the plaintiff separately challenges the validity of the search warrant, that challenge founders for the reasons set forth above. Therefore, even assuming that officers arrested the plaintiff inside his home without an arrest warrant immediately upon their arrival, the manner of their entry was not unlawful pursuant to *Payton* so long as they had probable cause to effectuate his arrest.

Turning to the second point, the charge on which a suspect is arrested is not determinative of whether there was probable cause for the arrest. *See, e.g., Wesby*, 138 S. Ct. at 584 n.2 ("Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking."). It is undisputed that Senior's truck was in plain view upon officers' arrival at the plaintiff's residence. The plaintiff has not argued that its value was below the threshold for a Class B theft. *See* Opposition at 17-18. In any event, even assuming that the truck alone did not meet the threshold, the combined property surely did. The plaintiff had never contested that he possessed his father's truck and firearms or that he had spent money from his father's bank account or generated from the sale of his father's property; instead, he had disputed any impropriety or unlawfulness of that

conduct. In the totality of the circumstances, officers had probable cause to arrest the plaintiff without a warrant for a Class B crime of theft pursuant to 17-A M.R.S.A. §§ 15(1)(A)(2) and 353(1)(A) & (B)(1).

Turning, finally, to the third point, the plaintiff's argument that he was arrested without probable cause likewise is unavailing. As the defendants argue, *see* Reply at 6-7, the plaintiff's reliance on *Thompson* is misplaced. In *Thompson*, officers arrested a man on a bus who was having an insulin shock reaction that officers mistakenly interpreted as intoxication. *See Thompson*, 620 F. Supp. at 484. The court found that officers had probable cause for the plaintiff's arrest but that, after he had been restrained, they had failed to challenge or reassess their assumptions "[i]n the face of a number of discordant facts[.]" *Id.* at 486.

Here, officers investigated the "discordant facts" of the plaintiff's and his father's versions of events prior to the plaintiff's arrest, and a Maine District Court determined that there was probable cause to believe that a crime had been committed and that evidence thereof would be found at the plaintiff's residence. For the same underlying reasons, officers had probable cause to arrest the plaintiff after arriving at his residence and observing that he remained in possession of his father's truck.

As the defendants note, *see* Motion at 25-26, 31, the absence of an underlying constitutional violation by an officer is fatal both to the plaintiff's claims of supervisory and municipal liability, *see, e.g., Wilson*, 294 F.3d at 6, and his claims that the defendants conspired to deprive him of his constitutional rights, *see, e.g., Nieves*, 241 F.3d at 53.

The defendants, accordingly, demonstrate their entitlement to summary judgment as to Counts VII through XII.

## C. Malicious Prosecution (Counts XIII-XV) (All Defendants)

The plaintiff brings claims pursuant to section 1983 against the individual defendants (Count XIII of his complaint), and the Town and Labombarde on municipal and supervisory liability theories (Counts XIV and XV), for malicious prosecution in violation of his Fourth, Fifth, and Fourteenth amendment rights based on his arrest and subsequent indictment. *See* Operative Complaint ¶¶ 157-77.[25]

The defendants seek summary judgment as to all three counts on the basis that the plaintiff fails to generate a triable issue as to any of the three elements of a constitutional violation predicated on malicious prosecution. *See* Motion at 20-23. I agree that the plaintiff fails as a matter of law to make the requisite showing that the criminal proceedings terminated in his favor. I need not and do not consider whether he fails to demonstrate a triable issue as to the remaining two elements.

### 1. Applicable Legal Standard

As a threshold matter, the defendants correctly note, and the plaintiff does not contest, that the plaintiff's malicious prosecution claims are properly analyzed solely pursuant to the Fourth Amendment. *See* Motion at 4; Opposition at 29; Reply at 3 n.5; *Albright*, 510 U.S. at 274.

A plaintiff bringing a Fourth Amendment claim of malicious prosecution pursuant to section 1983 must establish that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hernandez-Cuevas*, 723 F.3d at 101 (citation and internal quotation marks omitted).

---

[25] Although Counts XIII through XV are styled as having been brought pursuant to section 1983, the plaintiff alleges Maine as well as federal constitutional violations. *See* Operative Complaint ¶¶ 163, 170, 175. Analysis of the plaintiff's claims pursuant to section 1983 is dispositive of any parallel Maine constitutional claims. *See, e.g., Jackson*, 751 F. Supp.2d at 275.

## 2. Analysis

The parties have stipulated that, on September 14, 2015, the criminal proceedings against the plaintiff were dismissed by the Lincoln County District Attorney's Office pursuant to Me. R. Crim. P. 48(a) with the stated reasons for dismissal: "[X]Other The victim and key witness in the case for the State, Scott Jordan Sr, has died[.]"  Stipulated Facts ¶ 35.

The plaintiff argues that the prosecution was terminated in his favor because the prosecutor dismissed and abandoned it, a proposition for which he cites *Page v. Cushing*, 38 Me. 523, 527-28 (1854), *Bickford v. Lantay*, 394 A.2d 281 (1978), and *Wynne v. Rosen*, 464 N.E.2d 1348, 1350-51 (Mass. 1984).  *See* Opposition at 32-33.  However, none of those cases holds that a termination based on the death of a witness constitutes a termination in the plaintiff's favor.  *See Wynne*, 464 N.E.2d at 1351 (holding that "a criminal prosecution is terminated in favor of the plaintiff when the district attorney formally abandons the criminal proceedings by a nolle prosequi or a motion to dismiss" but adding that "the reasons stated for the nolle prosequi or dismissal must be consistent with the innocence of the accused[,]" and "[t]he circumstances of the abandonment must compel an inference that there existed a lack of reasonable grounds to pursue the prosecution"); *Bickford*, 394 A.2d at 283 (holding that "in a tort claim for malicious prosecution a showing that the criminal prosecution in which the plaintiff was the accused terminated with the entry of a Nolle prosequi *over the objection of the accused* is sufficient to prove the essential element of the tort that the criminal prosecution terminated in an outcome favorable to the plaintiff") (emphasis added); *Page*, 38 Me. at 524, 527 (holding that lower court did not err in refusing defendants' request to instruct jury that plaintiffs had to show "that the respondent in the prosecution has been acquitted of the charge in the complaint" when no such showing could be made because it did not appear that

respondent "was ever arrested, or arraigned for trial, or that he was directly charged with an offense").

To the contrary, in *Wynne*, the court held that a dismissal was favorable to the accused when the stated reason for the dismissal "indicate[d] a lack of reasonable grounds to prosecute" and "implie[d] the innocence of the accused." *Wynne*, 464 N.E.2d at 1351.

By contrast, in this case, as the defendants argue, *see* Motion at 23, the stated reason for the dismissal – that the key witness had died – does not imply the plaintiff's innocence, *see, e.g., Shapiro v. Haenn*, 190 F. Supp.2d 64, 68 (D. Me. 2002) ("When an earlier case ends in a dismissal instead of a judgment, the Court must determine whether the dismissal was purely procedural or indicates that the lawsuit was groundless on the merits. For example, a dismissal on pure statute of limitations grounds is not a favorable termination, but a dismissal because the complaint failed to state an essential element of the claim is deemed favorable to the defendant.") (citations omitted); *Palmer Dev. Corp. v. Gordon*, 1999 ME 22, ¶ 10, 723 A.2d 881, 884 ("To insure that the guilty person is not awarded a bonus there is a requirement in the malicious prosecution action that the proceeding has terminated favorably to the plaintiff, and that the favorable termination be on the merits, or at least reflect on the merits, of the action.").

The plaintiff attempts to distinguish *Haenn* and *Palmer* on the basis that they concern claims of malicious civil, rather than criminal, prosecution. *See* Opposition at 33. However, as the Law Court explained in *Palmer*, the civil tort of wrongful use of civil proceedings is rooted in the criminal, and the requirement that a proceeding terminate favorably to the plaintiff "carries over to the wrongful use of civil proceedings[.]" *Palmer*, 1999 ME 22, ¶ 10; 723 A.2d at 884 (explaining that, in the civil context as in the criminal, "[s]ociety does not want litigants who

committed the acts of which they are accused, but who were able to escape liability on a 'technicality' or procedural device, to turn around and collect damages against their accuser").

Beyond this, my research discloses that at least one court has squarely held that a dismissal of a prosecution based on the death of a witness does not qualify as a termination favorable to the accused for purposes of a subsequent claim of malicious prosecution. *See Noble v. Huffman*, Civil Action No. 3:12-CV-139-H, 2012 WL 2131803, at *2 (W.D. Ky. June 12, 2012) ("Here, the order of dismissal did not reflect on the 'innocence of nor responsibility for the alleged misconduct.' Rather, the case was dismissed due to a witness having died resulting in the Commonwealth having 'insufficient evidence to proceed with this case any further at this time.' Thus, Plaintiff has failed to establish that the proceedings were terminated in his favor, in a manner necessary to succeed on his claim for malicious prosecution.").

The plaintiff's failure to demonstrate that the criminal proceedings against him terminated in his favor is fatal to his claims of malicious prosecution in violation of his Fourth Amendment rights. As the defendants note, *see* Motion at 25-26, 31, the absence of an underlying constitutional violation by an officer is fatal both to the plaintiff's claims of supervisory and municipal liability, *see, e.g., Wilson*, 294 F.3d at 6, and his claims that the defendants conspired to deprive him of his constitutional rights, *see, e.g., Nieves*, 241 F.3d at 53.

The defendants, accordingly, demonstrate entitlement to summary judgment as to Counts XIII through XV.

### D. Due Process/Defamation (Counts XX-XXII) (Hesseltine, Labombarde, Town)

The plaintiff alleges in Count XX of his complaint, brought pursuant to section 1983, that that Hesseltine and Labombarde violated his Fifth and Fourteenth amendment rights by making defamatory statements to the public and/or third parties falsely implicating him in serious criminal conduct or elder abuse. *See* Operative Complaint ¶¶ 203-10. In Counts XXI and XXII, he brings

claims for that conduct against the Town and Labombarde on municipal and supervisory liability theories. *See id.* ¶¶ 211-21.[26]

The defendants contend that the plaintiff's Fifth and Fourteenth amendment procedural due process claims are barred as a matter of law by the existence of adequate post-deprivation remedies under state law and that, even if they were not barred on that basis, the plaintiff falls short of demonstrating that the alleged defamation deprived him of liberty or property without due process of law. *See* Motion at 24-25.

The plaintiff contests the second point but fails to address the first, seemingly conceding it. *See* Opposition at 33-35; Reply at 13. In any event, that point is meritorious. "[A] procedural due process claim may not be redressed under section 1983 where an adequate state remedy exists." *Reid v. State of N.H.*, 56 F.3d 332, 341 (1st Cir. 1995). Maine recognizes the common law tort of defamation. *See, e.g., Loe v. Town of Thomaston*, 600 A.2d 1090, 1092-93 (Me. 1991). Hence, the plaintiff has an adequate post-deprivation remedy pursuant to state law. *See, e.g., Brown v. Ferrara*, No. 2:10-cv-523-GZS, 2012 WL 2237223, at *4 (D. Me. June 15, 2012) (citing *Reid* for proposition that plaintiff's claim pursuant to section 1983 for procedural due process violations failed because Maine recognized common law torts that included civil perjury).

Hesseltine, Labombarde, and the Town accordingly are entitled to summary judgment as to Counts XX through XXII.

---

[26] Although Counts XX through XXIII are styled as having been brought pursuant to section 1983, the plaintiff alleges Maine as well as federal constitutional violations. *See* Operative Complaint ¶¶ 208, 214, 219. Analysis of the plaintiff's claims pursuant to section 1983 is dispositive of any parallel Maine constitutional claims. *See, e.g., Jackson*, 751 F. Supp.2d at 275.

### E. State Law Tort Claims (Counts XVI-XIX, XXIII-XXIV) (All Defendants)

The plaintiff sues all of the defendants pursuant to Maine law for the commission of the torts of malicious prosecution (Count XVI), false imprisonment (Count XVII), and intentional and negligent infliction of emotional distress (Counts XVIII and XIX), *see* Operative Complaint ¶¶ 178-202, and defendants Labombarde and Hesseltine for the torts of defamation (Count XXIII) and false light (Count XXIV), *see id.* ¶¶ 222-30.

The defendants contend that, based on the undisputed facts, the plaintiff fails to establish a *prima facie* case with respect to any of those claims and that, in any event, the Town is entitled to absolute immunity and the individual defendants to qualified immunity pursuant to the Maine Tort Claims Act ("MTCA"), 14 M.R.S.A. § 8101 *et seq. See* Motion at 32-38. I agree that, for those reasons, summary judgment is warranted.

#### 1. Malicious Prosecution (All Defendants)

To make out a claim for malicious prosecution in Maine, a plaintiff must show that: "(1) [t]he defendant initiated, procured or continued a criminal action without probable cause; (2) [t]he defendant acted with malice; and (3) [t]he plaintiff received a favorable termination of the proceedings." *Trask v. Devlin*, 2002 ME 10, ¶ 11, 788 A.2d 179, 182.

Because, as discussed above, the plaintiff fails to demonstrate that he received a favorable termination of the proceedings against him, the defendants are entitled to summary judgment as to his tort claim for malicious prosecution.

#### 2. False Imprisonment (All Defendants)

"False imprisonment involves the unlawful detention or restraint of an individual against his will." *Nadeau v. State*, 395 A.2d 107, 116 (Me. 1978) (citation omitted). "To be actionable, the authority upon which plaintiff is confined must be unlawful, as where a warrant is defective

on its face, or where an officer uses excessive force to arrest, or unreasonably delays in bringing the arrested person before a magistrate." *Id*. (citations omitted).

The plaintiff contends that the defendants are liable for this tort on the basis of his arrest at home without a warrant or exigent circumstances and without probable cause, incorporating by reference his discussion in connection with his constitutional claims. *See* Opposition at 38. For the same reasons as I have determined the defendants are entitled to summary judgment on the plaintiff's constitutional claims of false arrest, they are entitled to summary judgment on his tort claim for false arrest.

### 3. Intentional and Negligent Infliction of Emotional Distress (All Defendants)

To make out a claim for the intentional infliction of emotional distress ("IIED") pursuant to Maine law, a plaintiff must show that:

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct;

(2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community;

(3) the actions of the defendant caused the plaintiff's emotional distress; and

(4) the emotional distress suffered by the plaintiff was so severe that no reasonable [person] could be expected to endure it.

*Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 22-23 (citation, internal quotation marks, and footnote omitted) (brackets in original).

"[W]hen . . . the existence of the fourth element cannot be inferred from the extreme and outrageous nature of the defendant's conduct alone, a plaintiff must prove that . . . her emotional distress was so severe as to have manifested objective symptoms demonstrating shock, illness, or other bodily harm." *Lyman v. Huber*, 2010 ME 139, ¶ 23, 10 A.3d 707, 713. The Law Court

"do[es] not preclude the possibility that this can be achieved without the corroborating testimony of an expert medical or psychological witness[,]" but considers "[t]hat possibility . . . remote." *Id.*

Proof of negligent infliction of emotional distress ("NIED") requires a showing that "[the defendant] owed a duty to [the plaintiff]; that [the defendant] breached its duty; that [the plaintiff] suffered severe emotional distress; and that [the defendant's] conduct caused the harm." *Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶ 23, 133 A.3d 1021, 1028.

The defendants assert that the plaintiff cannot demonstrate either the severe emotional distress or outrageous conduct that they contend both torts require. *See* Motion at 34. While proof of NIED does not require a showing that the defendant's conduct was extreme and outrageous, it does require a showing of severe emotional distress. *See, e.g., Oceanic Inn*, 2016 ME 34, ¶ 23, 133 A.3d at 1028.

The plaintiff rejoins that a jury reasonably could find that the defendants inflicted severe emotional distress on him based on their investigation of him as to the unverified claims of Senior, their search of his home pursuant to an invalid search warrant, his arrest, incarceration, and prosecution for crimes that there was no probable cause to believe that he had committed, and the imposition of conditions of release that prevented him from being able to say goodbye to his father before he died. *See* Opposition at 38. He adds that Hesseltine and Labombarde inflicted severe emotional distress on him in refusing to cooperate with his employer's internal investigation after the charges were dismissed, prolonging that investigation. *See id.*

He contends that this conduct "was clearly so extreme and outrageous as to exceed all possible bounds of decency" and that a reasonable jury could find that he suffered distress so severe that a reasonable person could not be expected to endure it. *Id.* at 39.

42

The plaintiff falls short of demonstrating any triable issue that he suffered severe emotional distress or that, for purposes of the IIED claim, was subjected to extreme and outrageous conduct.

As discussed above, the plaintiff fails to demonstrate the existence of a triable issue that the search of his home, or his arrest, incarceration, or prosecution, were unlawful. That conduct cannot, as a matter of law, be characterized as extreme or outrageous. That Hesseltine and Labombarde refused to cooperate with the plaintiff's employer's internal investigation likewise cannot be characterized as extreme and outrageous conduct.

In turn, severe emotional distress cannot be inferred from the nature of the conduct alone. The plaintiff makes no alternative showing that he suffered such distress. *See* Opposition at 38-39.

The defendants, accordingly, are entitled to summary judgment as to the plaintiff's IIED and NIED claims.

### 4. Defamation and False Light (Labombarde and Hesseltine)

To make out a claim of defamation pursuant to Maine law, a plaintiff must demonstrate the existence of "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Rice v. Alley*, 2002 ME 43, ¶ 19, 791 A.2d 932, 936 (citation and internal quotation marks omitted).

Maine defines the tort of false light as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Cole v. Chandler*, 2000 ME 104, ¶ 17, 752 A.2d 1189, 1197 (quoting Restatement (Second) of Torts § 652E (1977)).

The plaintiff asserts that the following statements were false and defamatory and placed him in a false light:

1.     Labombarde's November 25, 2014, statement that this was a "case of elder abuse[,]" which was published in a Portland Press Herald article.  Opposition at 34.

2.     Labombarde's March 18, 2015, statement that this was "a classic scenario of elder abuse," which was published in a Lincoln County News article.  *Id.*[27]

3.     Hesseltine's March 18, 2015, statement, published in the same article, that "[t]here is no statute for elder abuse, it falls under theft[,]" describing it in another manner as "financial exploitation of the elderly."  *Id.*[28]

4.     Hesseltine's November 2014 statement to the plaintiff's employer that he was conducting a criminal investigation of the plaintiff concerning the allegation that the plaintiff had taken advantage of his father's mental state and had him sign over his power of attorney to him when he was in no condition to know what he was doing and, as a result, had taken possession of his father's bank account and personal possessions, including firearms and a truck, and transferred them to his own use.  *See id.* at 35.

However, as the defendants argue, *see* Motion at 35-36, the plaintiff fails to demonstrate the falsity of these statements.  Labombarde's 2014 statement, and Labombarde's and Hesseltine's 2015 statements, were published in newspaper accounts describing the plaintiff's arrest and

---

[27] This assertion is not set forth in the parties' statements of material facts.  However, because it is supported by Amended Exh. Y (ECF No. 57-1) to the Plaintiff's Amended Opposing SMF and is any event not outcome-determinative, I have considered it.

[28] Again, this assertion is not set forth in the parties' statements of material facts, but I have considered it because it is supported by Amended Exh. Y and is in any event not outcome-determinative.

subsequent indictment on charges of the unauthorized taking of the property of his father. *See* Exh. V (ECF No. 52-21) to Plaintiff's Original Opposing SMF; Amended Exh. Y. In that context, they accurately reflected the nature of the case against the plaintiff, which was a matter of public interest. The statements, therefore, were neither false nor depicted the plaintiff in a false light.

In a similar vein, Hesseltine's 2014 statement to the plaintiff's employer accurately described the nature of the allegations against the plaintiff that police were investigating, which was a matter of public record.

Labombarde and Hesseltine, accordingly, are entitled to summary judgment as to the plaintiff's defamation and false light tort claims against them.

### 5. MTCA Immunity

The plaintiff fails to address the defendants' alternative argument that, pursuant to the MTCA, the Town is entitled to absolute immunity as to his tort claims, seemingly conceding the point. *See* Motion at 37-38; Opposition at 35-37, 39; Reply at 14-15 & n.9.

In any event, as the defendants argue, *see* Motion at 37, the plaintiff's tort claims against the Town fail as a matter of law because none of the Town's alleged acts implicates a duty owed or conduct that falls within the enumerated exceptions to governmental liability pursuant to the MTCA, *see* 14 M.R.S.A. §§ 8103, 8104-A, and the Town has not waived its state tort immunity through the purchase of any policy of liability insurance, having limited its coverage to areas in which the Town is not immune, *see* 14 M.R.S.A. § 8116, Defendants' SMF ¶ 103; Plaintiff's Amended Opposing SMF ¶ 103.

The plaintiff does contest the defendants' further argument that the individual defendants are entitled to both discretionary and intentional-act immunity pursuant to the MTCA because their conduct was not "so egregious as to exceed any discretion" they had, and any intentional acts or

omissions were not the product of "bad faith." Motion at 36-37 (citations and internal quotation marks omitted); Opposition at 39.[29]

He asserts that Hesseltine and Labombarde have no immunity for defamatory statements, as those statements were not a discretionary function and the MTCA does not shield defendants from publishing defamatory statements. *See id*. However, I have determined that the statements were not defamatory. The plaintiff adds that the defendants are not entitled to immunity as to his additional tort claims "as a reasonable jury could find the conduct so egregious that it falls outside the scope of immunity provided by the state." *Id*. However, he does not explain, nor is it apparent, what conduct of each defendant could be found egregious. *See id*.

The defendants, accordingly, are entitled to immunity as to the plaintiff's state-law tort claims.

### F. Vicarious Liability (Count XXV) (Town)

In Count XXV of his complaint, the plaintiff alleges that the Town is "vicariously liable for the unlawful and/or tortious conduct of [its] agents, employees and/or servants[.]" Operative Complaint ¶ 233. The defendants seek summary judgment as to this count on the bases that a municipality cannot be held vicariously liable for its employees' actions pursuant to section 1983 and the Town is absolutely immune from liability for the plaintiff's tort claims pursuant to the MTCA. *See* Motion at 38-39.

---

[29] Municipal employees in Maine are absolutely immune from personal civil liability for performing or failing to perform any discretionary function or duty, whether or not the discretion was abused, 14 M.R.S.A. § 8111(1)(C), and for any intentional act or omission within the course and scope of employment, so long as the employee's actions are not found to have been in bad faith, 14 M.R.S.A. § 8111(1)(E). Discretionary function immunity is afforded officers "except to the extent they act in a manner so egregious as to clearly exceed, as a matter of law, the scope of any discretion [they] could have possessed in [their] official capacity as [police officers]." *Comfort v. Town of Pittsfield,* 924 F. Supp. 1219, 1236 (D. Me. 1996) (citation and internal quotation marks omitted).

The plaintiff fails to address these points, seemingly conceding them. *See* Opposition at 35-37. In any event, the defendants are correct both that a municipality cannot be held vicariously liable pursuant to section 1983, *see, e.g., Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("[U]nder § 1983, local governments are responsible only for their *own* illegal acts" and "are not vicariously liable under § 1983 for their employees' actions.") (citations and internal quotation marks omitted) (emphasis in original), and that the Town is entitled to absolute immunity under the MTCA, for the reasons discussed above.

The Town, accordingly, is entitled to summary judgment with respect to the Count XXV.

## G. Punitive Damages (Count XXVI) (All Defendants)

In Count XXVI of his complaint, the plaintiff seeks punitive damages as to all of the defendants. *See* Operative Complaint ¶¶ 234-37. The plaintiff's failure to generate triable issues as to his substantive federal and state-law claims undermines his claim for punitive damages. *See, e.g., Pan Am Sys. v. Hardenbergh*, 871 F. Supp.2d 6, 18-19 (D. Me. 2012) (dismissing claim for punitive damages when the "underlying causes of action [we]re insufficient to state a claim"; noting that "punitive damages are not a separate cause of action but, rather, an element of damages in, and thus wholly derivative of, the plaintiff's . . . claim").

## IV. Conclusion

For the foregoing reasons, I **GRANT** the defendants' motion for summary judgment as to all claims against them.

Dated this 28th day of September, 2018.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge